UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:05CR 14 ERW |
| | ) | |
| SALVATORE VINCENT FAZIO, | ) | |
| | ) | |
| Defendant(s). | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Defendant is charged in a three-count superseding indictment, with one count of transporting

child pornography in interstate commerce in violation of 18 U.S.C. § 2252A(b)(1); one count of

possession of child pornography which was produced using materials that traveled in interstate

commerce in violation of 18 U.S.C. § 2252A(a)(5)(B); and one count of knowingly possessing a

firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1).

Defendant filed Defendant's Motion to Suppress Evidence and Statements (Document #55)

asking the court for an order suppressing as evidence any physical evidence seized from the person

or possession of this defendant and any oral or written statements made by defendant to any federal,

state or local law enforcement agents. The government filed Government's Memorandum in

Opposition to Defendant's Motion to Suppress Evidence and Statements (Document #60).

Following the evidentiary hearing, the parties requested time in which to file memoranda and

a schedule was set. Later the parties decided they would not file post-hearing memoranda.

**Factual Background**

During October 2003, a Phoenix Division, Federal Bureau of Investigation Special Agent, Kari Marsh, was acting in an undercover capacity on the internet. On October 4, 2003, Agent Marsh created an undercover identity and Yahoo! Account for the investigation of unlawful trafficking of child pornography. On the same day, she was invited to join a Yahoo! Group. On October 7, 2003, Agent Marsh joined the Yahoo! Group and during the course of her investigation, the name of the group changed more than ten times (i.e., nurzrey school, morning_playtime, our_sunrise_specials). Although the name of the Yahoo! Group Agent Marsh joined changed several times, the group will be referred to as "our-sunrise_specials" throughout this report and recommendation. By October 8, 2003, Agent Marsh started documenting the activity she observed which she considered unlawful while participating in Yahoo! Groups. Specifically, from October 15 to October 24, 2003, Agent Marsh documented evidence about the group members of "our_sunrise_specials," by recording evidence of transmissions of child pornography utilizing programs such as Snag It, which captures the computer screen as viewed by Agent Marsh.

Yahoo! Groups is a free service that allows users to bring together family, friends or associates through a web-site and e-mail group. Users with a common interest can create and manage their own internet-based forum for that interest. Additionally, groups provide a web-site where members can post photographs and other files, such as video files. Members may access the photographs and files of other members by accessing the Yahoo! Group web-site.

While viewing photo albums of group members from "our_sunrise_specials." Agent Marsh saw "Sals" photo album and observed that on October 13, 2003, the individual using the screen name "salvatorejrf" posted four visual depictions of naked children. According to the "our_sunrise_specials" photo page, these four images were created by "salvatorejrf." Agent Marsh

- 2 -

recorded her observations and then worked to identify the individual associated with the "salvatorejrf" screen name.

October 29, 2003, Agent Marsh sent an administrative subpoena to Yahoo! To get the account information for the screen name "salvatorejrf." Agent Marsh learned the "salvatorejrf" screen name was registered to Salvatore Jr., Fazio in Mountain View, Missouri, and that the Internet Protocol address he used at the time of his registration on Yahoo! Was 208.207.68.200. Agent Marsh was also provided with the log-ins of "salvatorejrf" between October 8 and October 28, 2003, along with the Internet Protocol (IP) addresses used by "salvatorejrf" during his on-line communications on those dates.

Every computer that wishes to talk on the web has to have an address, which is called an IP address. An IP address is made up of four 8-bit numbers. Each of these numbers is separated by a decimal point. Since an 8-bit number can represent the decimal values 0-255, each of the four parts of an IP address can only be in that range. Once an IP address is identified, a public records search can be performed to determine the owner of an IP address.

In this case, Agent Marsh learned that Town Square Internet, Inc., was the owner of the IP address utilized by "salvatorejrf." The next step Agent Marsh took was to send an administrative subpoena to Town Square Internet, Inc., to determine which user had been assigned one of the IP addresses associated with "salvatorejrf." The response revealed that the IP address checked back to:

Salvatore Vincent Fazio
RR 2, Box 2929
Mountain View, MO 65548
Phone: (417) 934-5426,

and that the account had been open since November 27, 1999.

Once Agent Marsh discovered that the screen name "salvatorejrf" was associated with Salvatore Vincent Fazio of Mountain View, Missouri, the case information was forwarded to the FBI

office in Cape Girardeau for follow-up. Special Agent Alex Ghiz was assigned the case. Agent Ghiz conducted surveillance of the Mountain View residence on February 20, 2004. During the surveillance, Agent Ghiz took pictures of the defendant's residence located at RR 2, Box 2929 and determined directions to the residence. The photos and directions were made a part of the search warrant application that was presented to the undersigned United States Magistrate Judge in April 2004.

Additionally, Agent Ghiz ran a criminal history check and Department of Revenue check on Salvatore Vincent Fazio. Both records reported the RR 2, Box 2929, Mountain View, Missouri, address as the defendant's address. The checks also revealed that the defendant had a prior criminal record.

Agent Ghiz contacted the Shannon County Sheriff's Department concerning the defendant's residence and confirmed that the defendant did, in fact, live at RR 2, Box 2929, Mountain View. The Sheriff's Department had been called to the residence for numerous domestic disputes over the years and the law enforcement officers were quite familiar with the defendant.

On April 2, 2004, Agent Ghiz spoke with Bill Davis, the manager of Town Square Internet regarding Fazio. Davis stated that the defendant calls Town Square on a regular basis for assistance with his internet service. Mr. Davis noted that during the defendant's contacts for assistance, the defendant has mentioned that he logs on from home and that he is working as an undercover officer to locate missing and exploited children. Davis reported that the defendant's last call for technical support was March 22, 2004.

In April 2004, Special Agent Alex Ghiz applied for a search warrant for RR 2, Box 2929, Mountain View, Missouri, related to the unlawful possession and transportation of child pornography by Salvatore Vincent Fazio. The undersigned United States Magistrate Judge authorized the search.

On April 28, 2004, the search warrant was executed at Fazio's residence by several law enforcement officers. Agent Ghiz advised the defendant that the officers were there to execute a search warrant relative to a child pornography investigation. The defendant was informed that he was not under arrest and was given the search warrant to read. In addition, Agent Ghiz advised Fazio that if he chose to stay that he did not have to answer any of the officers' questions. Fazio indicated he was willing to answer questions.

In summary, on April 28, 2004, Mr. Fazio claimed that he was acting in an undercover capacity to identify missing and exploited children. The defendant admitted that he had downloaded images of children from the internet and uploaded them on other sites. Agent Ghiz prepared a report regarding Fazio's statements.

During the course of the interview, Agent Ghiz asked Mr. Fazio if he would consent to the officers' assuming his e-mail accounts for investigative purposes and consent to a complete search of his computer, floppy diskettes, CD's and videocassettes. Agent Ghiz then reviewed the written consent forms with Fazio and Fazio signed the forms.

As a result of the search warrant execution, a number of items were seized. The officers seized the following items from Fazio's residence:

1.  a Compaq Presario desktop computer, serial number 3D9CDCTKP0NB;

2.  a Quantum hard drive, serial number 165131-001;

3.  56 computer diskettes;

4.  2 compact discs;

5.  24 video-cassettes;

6.  notepads and papers containing web-site information;

7.  miscellaneous papers containing missing children posters;

8.      miscellaneous papers containing false identifications and forms; as well as

9.      nine firearms, two flare guns, one taser gun and assorted ammunition.

Agent Ghiz testified that no wiretaps were utilized during the investigation of Mr. Fazio. Additionally, a forensic analysis of Fazio's computer was conducted after the execution of the search warrant. Law enforcement officers did not gain access to Fazio's computer, or hard drive, prior to the execution of the search warrant. Agent Ghiz's testimony continued that law enforcement agents did not manipulate Fazio's e-mail correspondence so that it would cross state lines. When the defendant posted the images from his personal computer at his residence in Mountain View, Missouri, to the Yahoo! Group "our_sunrise_specials," the images traveled across state lines, because the transmission traveled from the defendant's computer through his internet service provider in Missouri and onto the Yahoo! Server, which is located in the State of California. This communication between Fazio's computer in Missouri and the Yahoo! Server in California had to occur prior to the images' being posted in his photo album within the Yahoo! Group "our_sunrise_specials."

The defendant seeks to suppress any and all evidence seized on April 28, 2004, as well as any statements made by the defendant on April 28, 2004.

The court realizes that it is the one who issued the search warrant and to whom the case was later randomly assigned for the determination of pretrial motions. However, the findings and recommendations made by the undersigned are subject to de novo review by the District Judge who is the trial judge.


## Discussion

The defendant offers various grounds in support of his Motion to Suppress:

1.  The affidavit was insufficient to establish probable cause for issuance of the search warrant.

2.  Even if there were probable cause to believe that defendant himself had committed a criminal act some four and a half months earlier, there was insufficient basis stated in the affidavit from which to conclude that there was a reasonable likelihood that evidence of criminal activity could be found inside the residence which was searched.

3.  The investigating agents from the FBI unlawfully accessed defendant's computer in violation of his rights under the Fourth Amendment by penetrating their way into protected areas in which defendant had a reasonable expectation of privacy.

4.  After agents from the FBI penetrated his computer, defendant alleges, they were able in some way to manipulate his e-mail account so that e-mails and other internet transactions that would ordinarily have remained within the State of Missouri during the time in which they were transmitted, were instead rerouted across the state lines.  In doing so, defendant believes, government agents sought to create an element of interstate nexus in order to facilitate the filing of federal charges in the instant case.

5.  The evidence obtained through the issuance of administrative subpoenas was unconstitutionally obtained and must be suppressed.

6.  Defendant's statement was obtained as the direct result of the unlawful search of his residence or, in the alternative, was obtained in violation of his Fifth Amendment rights..

7.  Any consent to search that may have been provided by defendant was the product of an unlawful search and seizure and must be suppressed.  In the alternative,

any such consent was coerced and involuntary because of the false statements made by investigating officers during the execution of the search warrant.

The court will take up in order the defendant's cited grounds.

## **Probable Cause**

The defendant argues that the Search Warrant was issued without probable cause. The Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).

The standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant. As the Supreme Court stated in Gates more fully, Id.:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. Jones v. United States, 362 U.S., at 271, 80 S.Ct., at 736.

The Supreme Court rejected the prior tests required by Spinelli v. United States, 393 U.S. 410, 898 S.Ct. 584 (1969), finding that "the complex superstructure of evidentiary and analytical rules that some have seen implicit" in the Spinelli decision cannot be reconciled with the fact that many warrants quite properly are "issued on the basis of non-technical, commonsense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." Id. at 235, 2331. The Court offered the following caution to reviewing courts, Id. at 236, 2331:

Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of <u>de novo</u> review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." <u>Spinelli</u>, <u>supra</u>, 393 U.S., at 419, 89 S.Ct., at 590. "A grudging or negative attitude by reviewing courts toward warrants," <u>Ventresca</u>, 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." <u>Id</u>., at 109, 85 S.Ct., at 746.

Probable cause is

a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes for many different types of persons. As we said in <u>Adams v. Williams</u>, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972): "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity.

<u>Gates</u>, 462 U.S. at 232, 103 S.Ct. at 2329.

The Supreme Court continued, 462 U.S. at 231, 103 S.Ct. at 2328, quoting from <u>Brinegar v. United States</u> (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

The Court, in a somewhat lengthy recitation of facts drawn from the Affidavit of Agent Alex Ghiz, will review what was offered as justification or probable cause for the issuance of the search warrant for Mr. Fazio's residence.

As a preface, Agent Ghiz stated that the factual information contained in the affidavit was based on his investigation of Mr. Fazio's case, his study of Yahoo! and Yahoo! Groups and information supplied through the investigations of other FBI agents. The information based upon observations of Agent Ghiz and his firsthand information is deemed to be reliable. <u>Illinois v. Gates</u>,

462 U.S. 213, 103 S.Ct. 2317 (1983). The same thing is true of the information obtained firsthand by Special Agent Kari Marsh. Id. In United States v. Wilson, 964 F.2d 807, 809 (8th Cir. 1992), the Court found that knowledge of one officer is considered the knowledge of all officers cooperating in an investigation.

As Agent Ghiz stated at paragraph 8 of the affidavit, Agent Marsh created an undercover identity and a Yahoo! account for that identity on the internet. On October 4, 2003, Agent Marsh, in her undercover capacity, received an e-mail invitation to join the Yahoo! Group "nurzrey_skool." The e-mail was sent by an unidentified Yahoo! user not previously known to Agent Marsh. The invitation was to a group that had restricted membership and required an invitation by the owner or moderator of that group. On October 7, 2003, Agent Marsh responded affirmatively to the invitation and joined the Yahoo! Group, which had then changed its name to "morning_playtime." On October 10, 2003, "morning_playtime" was closed and, again, Agent Marsh, in her undercover capacity, received an e-mail invitation to join the Yahoo! Group called "still_morning." Agent Marsh joined the group. One of the names that "still_morning" changed to was "sunrise_special" and "our_sunrise_specials." Agent Marsh received an e-mail invitation to join a Yahoo! Group called "sunshine-supergrrl," which was a spinoff of "our_sunrise_specials." Agent Marsh joined the Yahoo! Group "sunshine-super_grrl." The numerous names adopted by the Yahoo! Groups are set out in the affidavit in paragraphs 11 and 12.

The affidavit continues that on October 8, 2003, and on multiple days thereafter, Agent Marsh accessed the Yahoo! Groups previously identified and, partially through the use of Camtasia and Snagit software, collected and recorded evidence of the transmission of child pornography by multiple subjects in these groups. One of the subjects transmitting child pornography via the Yahoo! Groups was a subject using the Yahoo! ID of "salvatorejrf" which was part of the Yahoo! Group

"our_sunrise_specials."  A description of the child pornography transmitted by "salvatorejrf" are set out in paragraphs 15, 15.1, 15.2, 15.3 and 15.4 of the affidavit.

The court finds the pictures described in paragraphs 15.1 through 15.4 meet with the definition of child pornography set out in Title 18 United States Code § 2252A and contained in paragraphs 5, 6 and 7 of the affidavit.

The affidavit sets out further the steps taken by Agent Marsh to identify by name and address the Yahoo! ID "salvatorejrf."  As the defendant is aware and has related in his Memorandum in Support of his Motion to Suppress (Document #55), an administrative subpoena to Yahoo! provided information that "salvatorejrf" was registered to Mr. Salvatore Jr., Faziio, in Mountain View, Missouri.  Yahoo! also provided a list of "salvatorejrf's" logins between October 8, 2003, and October 28, 2003, as well as the Internet Service Provider (ISP) addresses for each time "salvatorejrf" logged in to Yahoo!.

The affidavit continues that a public record search for the owner of the ISP addresses identified in the Yahoo! user log for "salvatorejrf" led to Town Square Internet Inc., which was served a subpoena, which revealed the name and address of the internet user assigned the ISP address mentioned in the subpoena as Salvatore Vincent Fazio, address, RR 2, Box 2929, Mountain View, MO 65548.

The affidavit continues that Agent Ghiz's division conducted further investigation and determined that Mr. Salvatore Vincent Fazio does, in fact, live at the address provided by Town Square Internet Inc.  The defendant criticizes the last statement saying "the affidavit failed to state in what manner, if any, investigating agents were able to confirm Defendant's current address."  Statements of law enforcement officers based on their own observations carry their own reliability.

> Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number. [footnote

4] We conclude that the affidavit showed probable cause and that the Court of Appeals misapprehended its judicial function in reviewing this affidavit by giving it an unduly technical and restrictive reading.

United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 747 (1965).  See also Pennsylvania v. Labron, 518 U.S. 938, 939 (1996); McDonald v. United States, 335 U.S. 451, 454-55 (1948); United States v. Gerard, 362 F.3d 484, 489 (8th Cir. 2004).  The further steps taken by the local FBI agent were related in the evidentiary hearing on the motion to suppress and were set out in the Factual Background section at the beginning of this report and recommendation; however, the additional steps to corroborate the address of Mr. Fazio were not further enumerated in the affidavit.  However, in view of the cases just cited, the Magistrate Judge was justified in relying upon the statement by Agent Ghiz that "my division conducted further investigation and determined that: Salvatore Vincent Fazio (Fazio) does in fact live at the address provided by Town Square Internet Inc." as carrying its own reliability.

The affidavit relates the functions of Yahoo! Games service and web features of the Yahoo! Groups.  The affidavit of Agent Ghiz continues that Yahoo! Groups include pornographic groups, some which are child pornographic.  When a user creates a Yahoo! Group, he or she becomes the group owner.  The owner has the ability to restrict or close membership to the group, invite or ban members to or from the group, limit accessibility to the group and control various other aspects of the group's administration.  Membership in child pornographic groups is typically closed or restricted, meaning that an individual can only be admitted to the group by invitation or acceptance of the owner or possibly a moderator.  In order to access the web features of the Yahoo! Groups service, a user must have a Yahoo! ID and must sign in.  Agent Marsh's Yahoo! ID was "catacomb75."

The affidavit continues that based upon Agent Ghiz's experience and training and that of Computer Forensic Examiner Anthony Box, of St. Louis, Missouri, computer files or remnants of

such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years. Even when such files have been "deleted," they can be recovered months or years later using readily-available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Deleted files or remnants of deleted files may reside in the free space or slack space for long periods of time before they are overwritten. Files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."

The foregoing information contained in the affidavit of Special Agent Alex Ghiz sets out that Special Agent Kari Marsh of the FBI created an undercover identity and a Yahoo! account for that identity on the Internet. She was invited to join Yahoo! Groups which were engaged in the posting, sending and viewing of child pornography. Four pictures of child pornography were posted by an individual determined to be the defendant, Salvatore Vincent Fazio, whose address was found to be Rural Route 2, Box 2929, Mountain View, Missouri 65548. The images posted by the defendant meet the definitions of child pornography set out Title 18 United States Code § 2252A.

This court finds that when the search warrant for the defendant's residence was issued, the magistrate judge "had a 'substantial basis for ... conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S., at 238, 103 S.Ct., at 2332 (1983).


### Insufficient Showing That Pornographic Material in Defendant's Residence Allegedly Posted on October 13, 2004, Was Still in the Residence on April 28, 2004

The defendant argues that, even if there were probable cause to believe that defendant himself had committed a criminal act some four a half months earlier, there was insufficient basis stated in the

affidavit from which to conclude that there was a reasonable likelihood that evidence of criminal activity could be found inside the residence which was searched.

The court has previously reviewed the affidavit of Agent Ghiz to the effect that computer files or remnants of those files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed by the internet. Even when such files have been "deleted," they are not really permanently removed from the computer but can be recovered months or years later. When a person deletes a file on a home computer, the data remains on the hard drive until it is overwritten by new data. See paragraph 22 of the affidavit. The information to establish probable cause does not require proof beyond a reasonable doubt or by a preponderance of the evidence but only that there be a substantial basis for the judge to conclude that probable cause exists. <u>Gates</u>, 462 U.S. at 238, 103 S.Ct. at 2332. The court finds that there was a substantial basis for the magistrate judge to conclude that there was a reasonable likelihood that the evidence of criminal activity which was placed on "our_sunrise_specials" website on October 13, 2003, was still in the defendant's computer when the search warrant was executed on April 28, 2004.

<u>Accession to Defendant's Computer by</u><br><u>Penetrating into Protected Areas</u>

The defendant claims that FBI agents unlawfully accessed his computer in violation of his rights under the Fourth Amendment by penetrating their way into protected areas in which the defendant had a reasonable expectation of privacy.

Although the defendant testified at the evidentiary hearing, the defendant offered no evidence to support this allegation. The evidence was to the contrary. Agent Ghiz testified that there was no attempt to manipulate the defendant's online communications during the investigation of the defendant. No wiretaps were used. Agent Marsh received invitations to join the Yahoo! Groups and she did so. Government's Exhibit #1 introduced at the evidentiary hearing captures the screen

showing that on October 13, 2003, "salvatorejrf" posted four pictures.  The same Exhibit #1 shows that Agent Marsh was viewing this screen at the invitation of the owner or manager of the Group. In the upper lefthand corner appears "Welcome, catacomb75" showing that Agent Marsh, "catacomb75," was there by leave of the website owner.  Below the welcome appears the name of the group "our_sunrise_specials."  Agent Marsh observed the screen and pictures by invitation.  She did not unlawfully access the defendant's computer by penetrating her way into protected areas as maintained by the defendant.

## Manipulation to Create an Element of Interstate Nexus?

The defendant argues that after agents from the FBI penetrated his computer, they were able "in some way" to manipulate his e-mail account so that e-mails and other internet transactions that would ordinarily have remained within the State of Missouri during the time in which they were transmitted, were instead, rerouted across the state line.  In doing so, the defendant charges government agents sought to create an element of interstate nexus in order to facilitate the filing of federal charges in the instant case.  Again, there is absolutely no evidence to support the defendant's charge.

Detective Ken Nix has been a detective with the City of Clayton, Missouri, for eight years and has been assigned to the Internet Crimes Against Children Task Force for the State of Missouri for four years.  He has been a police officer with the City of Clayton for twenty-seven years.  Detective Nix stated that he had received in excess of 600 hours of computer forensic training and internet investigation training and he is familiar with online investigations of Yahoo! Groups associated with child pornography.  He is familiar with Snagit software which he described as a program that investigators use to capture something on a computer screen which the person is looking at and by

use of Snagit software, the person is able to save the image on the viewer's computer to various folders to save as forensic evidence of the investigation.

Detective Nix testified that whenever a subscriber logs onto a local provider, they dial in, get an access route, then type in a URL address (www.hotmail.com) which will take them to their server. Detective Nix testified that in the case at hand yahoo.com has its main server in California. He testified that there are a couple of other servers that they move throughout the United States, but none has ever been in Missouri and none were in Missouri at the time Detective Nix was testifying. Thus, when one obtains an access route, it will take them to their server in a state different from Missouri. In this way, the information must travel interstate. Detective Nix stated that it is not possible for law enforcement officers to manipulate an internet communication by using the IP address as shown on Exhibit #1. The IP address is specifically assigned to the subscriber.

The court finds that FBI agents did not manipulate the defendant's e-mail account so that the e-mail and other internet transactions that would ordinarily have remained within the State of Missouri were instead rerouted across the state lines, thus, establishing an interstate nexus. The defendant's argument is without substance.

**Administrative Subpoenas Unconstitutional?**

In defendant's argument concerning administrative subpoenas, he acknowledged that administrative subpoenas in the area of criminal investigations are generally enforceable as long as the issuing agency's investigation is being conducted pursuant to a legitimate purpose, the inquiry is relevant to that purpose, the information is not already within the agency's possession and the proper procedures have been followed. All that is the case here in which the administrative subpoenas were issued to both Yahoo! and to Town Square Internet Inc. under 18 U.S.C. §§ 3486 and 2703(c)(2). Defendant then goes on to attack subpoenas issued under the provisions of the Patriot Act which has

no application to the investigation of Mr. Fazio. Any deficiencies the defendant may argue apply to 18 U.S.C. § 2709, part of the Patriot Act, have no application to the subpoenas issued in the investigation under consideration. This argument of the defendant fails.

### Defendant's Statement and Consent to Search Were the Result of an Unlawful Search or in the Alternative Were Obtained in Violation of His Fifth Amendment Rights

The court will take up defendant's grounds 6 and 7 together because the defendant offers the same arguments for both.

The first part of the defendant's arguments, that the statement Mr. Fazio gave on April 28, 2004, and the consent to search were obtained as a direct result of the unlawful search of his residence, are based on his prior claim that the search warrant executed at the defendant's residence was issued without probable cause. The court has already found probable cause for the issuance of the search warrant and as a result, the first part of the defendant's arguments fails.

Next, the defendant claims that any statement he may have made during the execution of the search warrant and his consent to search were obtained in violation of his Fifth Amendment rights.

When the officers entered Mr. Fazio's residence, Agent Ghiz advised Mr. Fazio that the officers were not there to arrest him, that they were serving a search warrant on the residence. Agent Ghiz testified that Mr. Fazio's mother's residence was approximately fifty yards away, within walking distance from the defendant's house. Agent Ghiz asked to talk with Mr. Fazio. Agent Ghiz told Mr. Fazio that Mr. Fazio did not have to talk to Agent Ghiz if he did not want to and that he was not obligated to stay at the residence but that if he did stay, he'd have to stay in a chair and that he could not roam freely in the house. Agent Ghiz said the defendant was very cooperative, willing to talk, never confrontational and very friendly. A summary of the statements made by Mr. Fazio to Agent Ghiz were included in Government's Exhibit #7 introduced at the evidentiary hearing. The interview took place in the living room in the defendant's house with Mr. Fazio seated in a padded chair close

to the front door and Agent Ghiz in a chair approximately four to five feet in front of him on the other side of a coffee table. Agent Ghiz and Sheriff Butter Reeves of Wayne County were the only officers present. Sheriff Reeves stood off to the side and just observed. FBI Agents Blades and Allen were conducting a search of the residence while Agent Ghiz had the interview with Mr. Fazio, but they were not in the same room. The interview lasted about thirty minutes and, according to Agent Ghiz, was very friendly, very cooperative, basically like a conversation, without animosity. Agent Ghiz testified that the environment remained cooperative throughout the three hours it took to execute the search warrant. He stated that the defendant voluntarily acquiesced to questioning during the interview. Agent Ghiz said he treated the defendant very respectfully. Agent Ghiz did not raise his voice at the defendant and the defendant did not yell at Agent Ghiz or other officers during the execution of the search warrant. Agent Ghiz was aware that Mr. Fazio had frequently called Town Square Internet Inc. and that he commonly yelled and used obscene language. The defendant was not placed in handcuffs at any time on April 28, 2004.

The defendant's freedom of movement was restrained during the interview. Agent Ghiz stated that if the defendant wanted to stay in the house, he was required to stay in one location for officer safety. Agent Ghiz testified that if the defendant had wanted to leave the residence, he would have been allowed to leave. Agent Ghiz said there were a number of firearms seized from the residence on April 28, 2004. Agent Ghiz said the officers were concerned that there may be weapons in the residence because Sheriff Reeves had indicated that in the past Mr. Fazio was known to have weapons and he was potentially violent.

Agent Ghiz did not accuse the defendant of lying nor did he use any psychological ploys to encourage Mr. Fazio to talk. No strong-arm tactics were employed during the interview. According to Agent Ghiz, the defendant never attempted to leave during the execution of the search warrant or

the interview. Toward the conclusion of the interview, Agent Ghiz asked the defendant if he would be willing to continue to help in the investigation by allowing the FBI to use his online identity to access other sites to help investigate other child pornography crimes. The defendant was willing to cooperate and gave consent to the FBI's assuming his online presence. Government's Exhibit 8, a copy of a form entitled Consent to Assume Online Presence, was introduced at the evidentiary hearing. It was signed by the defendant in the presence of Agent Ghiz. Agent Ghiz asked the defendant if he would sign a consent form for the search of his actual computer and any discs that were seized from the residence, as well as another hard drive located in the home, diskettes, CD's and videos, for all of which the defendant also gave consent. Agent Ghiz read both consent forms, the consent to assume the online presence and the consent to search the computer and the discs, hard drive and the other items such as discs, to the defendant. The consent forms provided that the defendant had a right to refuse consent.

As noted, the defendant was not arrested when the execution of the search warrant was completed. Agent Ghiz said he did not arrest the defendant at the conclusion of the execution of the search warrant because the investigation was still ongoing with evidence to review and analyze prior to determining if an arrest was appropriate.

In the defendant's motion to suppress, the defendant relates that he was required to remain seated in a small chair in the living room of his home and was kept at all times in the company of one or more law enforcement officers. He states that his liberty was restrained to the extent that when he asked to use the bathroom, some time well into the execution of the search warrant, he was not permitted to use his own bathroom but was required to relieve himself outdoors in the custody of law enforcement officers.

The restraint upon the defendant's movement about the house, if he wanted to remain within the house, was appropriate. A search warrant implicitly carries with it the limited authority to detain the occupants of the premises while the search is conducted. Michigan v. Summers, 452 U.S. 692, 705 (1981). See also Illinois v. McArthur, 531 U.S. 326, 331-333 (2001). No other factors besides the issuance of the search warrant are needed to support detention. United States v. Wallace, 323 F.3d 1109 (8th Cir. 2003) (The detention and questioning of an employee during the execution of a search warrant was reasonable because it was not custodial interrogation.) The execution of a search warrant carries with it the authorization to maintain the status quo.

The defendant stated he requested copies of the two documents from Agent Ghiz, but Agent Ghiz ignored him, did not say anything and just went back into the computer room. The defendant stated he did not receive copies of either of the forms. The defendant stated that when he signed Exhibit #8, the consent to search his computer and other items connected with his computer, there was only one item, the Quantum hard drive with its serial number, listed thereon, and defendant thought his consent was simply to search that particular hard drive not the five items written on the form now. The defendant testified that he told the agents there was another hard drive in the other room for addresses that might be good for the investigation. He went back with Agent Ghiz to the bedroom to show him where the other hard drive was, he handed it to Agent Blades and then the defendant was returned to the living room. Defendant stated that that was the particular hard drive he gave consent to search with the signed form. The defendant testified he never gave written or verbal consent for the search of the other four items. It would have been completely illogical for the agents to whom the defendant gave authorization to adopt his online identity to take only the hard drive. The defendant read the search warrant which set out in Attachment B specifically – computers, hard drives, disks and equipment capable of having been used to provide images of child pornography

over the internet. The court finds that it would be very unusual for someone who gave a consent to search and a consent to remove a hard drive and who expressed the willingness to talk about his activities to Agent Ghiz to then claim that he was tricked into signing a consent to remove one item, the hard drive, and then later four other groups of items were added. Mr. Fazio volunteered to continue to help in the investigation. Everyone agreed that he was cooperative. The hard drive, which the defendant complains was the only item in the Consent to Search form when he signed it, is not listed first. It is second. To have prepared the form so that the first, third, fourth and fifth items could be inserted later after the defendant had signed the form would make Agent Ghiz more Machiavellian than Machiavelli. The defendant's claim flies in the face of the agents' whole purpose of being at the residence. At the bottom of the Consent to Search, which was read to the defendant and which he signed, are the printed statements "I have been advised of my right to refuse consent" and "I authorize these agents to take any items which they determine may be related to their investigation." Below these printed statements are the date and Mr. Fazio's signature, which he acknowledged at the hearing. Further, the defendant was given a receipt for the items taken. The court accepts the testimony of Agent Ghiz, that all five items listed on the Consent to Search form were on the form when Mr. Fazio signed it. All parties agree that the Consent to Search (Government's Exhibit #9) and Consent to Assume Online Presence (Government's Exhibit #8) were signed near the end of the search of defendant's residence.

The defendant stated he was required to remain in the living room throughout almost all the period of the search, and Sheriff Reeves was there throughout the whole time "like his guard." The defendant stated he had to ask to relieve himself twice, and he had sweats on so he had to pull his pants down in the front yard with his neighbor, John Smith, and federal agents watching. He stated he had asked Sheriff Reeves if he could use the bathroom in the house and he was not allowed to. He

was walked outside with officers standing behind while he relieved himself and then marched back in and sat down in his chair, he did not feel he was free to leave, he felt like he was under arrest, especially when Sheriff Reeves escorted him outside to use the bathroom and back into the home.

Although the defendant testified that he was told by Agent Ghiz that he would not be arrested if he continued to cooperate, Mr. Fazio stated he asked Agent Ghiz what would happen if another agency filed charges and Agent Ghiz's words were, "Never happen."

The defendant identified Exhibit #8 as an agreement which he signed giving the FBI permission to assume his identity on the internet. Exhibit #8 was read to the defendant before he signed it. The last sentence in the consent form states, "I have been advised of my right to refuse to allow the assumption of my online presence, and I hereby voluntarily waive this right."

Agent Ghiz testified that Sheriff Reeves remained with Mr. Fazio while Agent Ghiz helped with the search. Ghiz stated that from time to time he was out of hearing range of Sheriff Reeves and Mr. Fazio depending on what he was doing and where he was in the house. Agent Ghiz did not hear Sheriff Reeves say to Mr. Fazio that he was not free to leave, that he had to stay where he was. Agent Ghiz stated that Mr. Fazio may have asked Sheriff Reeves to use the bathroom, but Ghiz was not present when such a question was asked. Agent Ghiz testified that Mr. Fazio could have gone outside to relieve himself on his own. Agent Ghiz would not have stopped him. Agent Ghiz stated that Mr. Fazio was free to leave when the agents began the search and he was told so, but that if Mr. Fazio remained in the home, he had to stay in that one location for security reasons. Agent Ghiz stated that there had been a security sweep for other people and no weapons were located. Agent Ghiz stated that if Mr. Fazio had been free to leave and had he left without escort, he could have returned to the home with a firearm. Agent Ghiz stated that he had no legal right to force Mr. Fazio to stay there; Mr. Fazio was not under arrest. He had the option to stay since it was his residence.

If Sheriff Reeves informed Mr. Fazio that he was not free to leave, it was without Agent Ghiz's authority or knowledge.

Agent Ghiz testified that he told the defendant that he would not be arrested that day. He did not tell the defendant that the defendant would never be arrested. Agent Ghiz testified in rebuttal that he did not say the words, "never happen." He stated he did not recall the defendant's question about what would happen if another agency came questioning about the defendant's activities. Agent Ghiz did not recall Mr. Fazio requesting a copy of the forms specifically, but he was provided a copy of a property receipt which listed the items. Agent Ghiz said he did not have a way of making copies of the forms at that time with signatures.

The court finds that from a consideration of the totality of the circumstances that the defendant was not in custody when he voluntarily consented to the interview with Agent Ghiz in his home. It was not necessary for the FBI to give the defendant <u>Miranda</u> warnings since <u>Miranda</u> warnings are only required when a defendant is both being interrogated and is in custody. <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990). The restraints the defendant complains of were authorized and proper during the execution of the search warrant. <u>Michigan v. Summers</u>, <u>supra</u>; <u>Illinois v. McArthur</u>, <u>supra</u>; <u>United States v. Wallace</u>, <u>supra</u>. This is especially true in view of Sheriff Reeves's informing Agent Ghiz and the Sheriff's being aware that in the past Mr. Fazio was known to have weapons and that he was potentially violent. Several weapons were actually found in the home during the search.

The defendant argues that he was not arrested after the search at his residence as a subterfuge because the agents did not want to acknowledge that Mr. Fazio actually was in custody when he gave his interview to Agent Ghiz. Agent Ghiz testified that the defendant was not arrested at the conclusion of the search because the investigation was still ongoing with evidence to review and analyze prior to determining if arrest was appropriate. The computers themselves and the tapes and

hard drive had not been examined. The evidence to arrest was based on the pictures gathered by Agent Marsh. If it turned out that the defendant was arrested and no illegal images were found on his computer, hard drive or disks, agents might well have had "egg on their faces." The court accepts Agent Ghiz's statement as a legitimate reason for not arresting the defendant that date.

Under the factors enumerated in <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990), the Court concludes that the defendant's Consent to Search his computer, hard drive, floppy diskettes, CD's and video cassettes (Government's Exhibit #9) was voluntary; his Consent to Assume Online Presence (Government's Exhibit #4) was voluntary; and his agreement to the interview at his home with Agent Ghiz was voluntary. Without going through every factor mentioned in <u>Chaidez</u> (which states the factors should not be applied mechanically), the undersigned notes that: (1) the defendant was in his 60's and certainly an adult when he was arrested; (2) his intelligence is certainly normal; (3) he was not intoxicated or under the influence of drugs when he consented; (4) he was informed that he did not have to speak to Agent Ghiz and both written forms of consent contained the statement above his signature that he was advised of his right not to consent; (5) because he had been previously convicted of robbery, assault with a deadly weapon, two additional armed robberies, and had been arrested on other charges, the defendant was familiar with the protections afforded to suspected criminals by the legal system.

Continuing with the <u>Chaidez</u> analysis and in considering the environment in which consents were given, the court finds: (1) the search of the defendant's residence was by search warrant; his interview lasted about thirty minutes; the search took about three hours; the defendant was cooperative, even suggesting that his hard drive in another room would help the investigation; (2) the defendant was not threatened, physically intimidated or punished by the law enforcement officers; (3) he did not rely on promises or misrepresentations made by the agents or sheriff; (4) he was not

in custody or under arrest when his consent was given; (5) he was in his own home but had earlier been told that he did not have to remain in the home when the search was begun but if he did remain that he would be required to stay in one place; (6) he did not object to the search but instead helped the search.

To render a statement involuntary or a consent involuntary, it must have been obtained in such a way that the suspect's will was overborne. United States v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001) . The court finds the defendant's will was not overborne. For examples of cases in which the defendant claimed tactics used by law enforcement officers were coercive, but the Eighth Circuit disagreed, See United States v. Mendoza, 85 F.3d 1347, 1350-51 (8th Cir. 1996). In Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 2336 (2000) (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n. 20, 104 S.Ct. 3138 (1984), the Supreme Court held "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." See also Simmons at 1132. In the same way, when a person has signed written consents which contain the warning that he does not need to sign the consent and when the person engages in an interview with law enforcement officers after being told that he need not talk to the officers, a colorable claim of compulsion or coercion is equally rare.

The court finds that the defendant voluntarily made his oral statement to Agent Ghiz.

The court further finds that the defendant voluntarily consented to the search of the items listed on the Consent to Search form (Government's Exhibit #9), and was not coerced. The defendant's Fifth Amendment rights were not violated.

**IT IS, THEREFORE, RECOMMENDED** that the Defendant's Motion to Suppress Evidence and Statements (Document #55) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(l), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of April, 2006.